**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| DEXTER PEARCE, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF PORTLAND, ANTHONY WHITMORE, GARRET HEMMERLEIN, TYLER BRUNELLE, MICHAEL RAINS, and CRAIG DOBSON, <br><br> Defendants. | Case No. 3:22-cv-00518-HZ <br><br> SECOND AMENDED COMPLAINT <br><br> Civil Rights Action (42 U.S.C. § 1983); and Battery (State Tort) <br><br> JURY TRIAL DEMANDED |

    On July 4, 2020, Mr. Dexter Pearce, Plaintiff, was out on the streets protesting the killing of Black people by United States police departments, including the Portland Police Bureau. He files this suit because the Defendants unlawfully shot him while at this protest. A Portland Police Officer shot Mr. Pearce in the back of his right calf with a 40 mm impact munition. The shot caused pain and damage to Mr. Pearce's Achilles tendon, which then required ongoing physical therapy and pain management. Mr. Pearce was not facing the officer at the time he was shot. He

heard no warning from the officer. Mr. Pearce posed no threat to the officer and complied with dispersal orders. The officer did not attempt to arrest Mr. Pearce and did not take him into custody after the shot. This is in keeping a pattern and practice of the City of Portland and the individually named Defendants of unlawfully punishing groups that express sentiments in support of police accountability or against white supremacy. Following this incident, no Portland Police officer was held accountable for injuring Mr. Pearce.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Dexter Pearce, Plaintiff, is a citizen of the State of Oregon.

4. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB").

5. Defendant Anthony Whitmore is a Portland Police Officer who under color of participated in Plaintiff's injury. On the evening in question, he was a member of the Mobile Field Force (hereinafter, "MFF"). He is sued in his individual capacity.

6.     Defendant Garrett Hemmerlein is a Portland Police Officer who under color of participated in Plaintiff's injury. On the evening in question, he was a member of the Mobile Field Force (hereinafter, "MFF"). He is sued in his individual capacity.

7.     Defendant Tyler Brunelle is a Portland Police Officer who under color of participated in Plaintiff's injury. On the evening in question, he was a member of the Mobile Field Force (hereinafter, "MFF"). He is sued in his individual capacity.

8.     Defendant Michael Rains is a Portland Police Officer who under color of participated in Plaintiff's injury. On the evening in question, he was a member of the Mobile Field Force (hereinafter, "MFF"). He is sued in his individual capacity.

9.     Defendant Craig Dobson is a Portland Police Officer who under color of participated in Plaintiff's injury. On the evening in question, he was the Incident Commander (hereinafter, "IC") on the date in question. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I. Introduction: Black Lives Matter.

10.    The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

11.    For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite

---

[1] https://www.portlandoregon.gov/police/article/32381

SECOND AMENDED COMPLAINT
Page 3 of 19

all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

12. On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

13. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

14. Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of

tear gas and impact weapons in a systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

15. Beginning on May 29, 2020, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

16. On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly as wanting protesters to "hurt."[2]

## II. PPB and Impact Munitions

17. PPB uses two different platforms for launching "riot" control munitions: an 18 mm, 15-round capacity, shoulder fired weapon called an FN303; and 40 mm, two round capacity, shotgun-style launcher. PPB uses the FN303 to deploy munitions containing OC powder designed to cause chemical irritation to anyone around the impact; munitions containing paint designed to both hurt the person and mark them with paint; and munitions containing sand to both hurt the target and cause non-chemical irritation. PPB uses the 40 mm launcher to fire foam tipped rounds designed to hurt people, foam tipped rounds with OC inside, and two types of "flash-bang" grenades: one that emits light and sound, and one that, in addition, spreads plastic shot over an area of people in order to hurt them.

18. Neither the FN303s nor the 40 mm launchers are accurate at long distances and become inaccurate altogether after several deployments. The use of FN303s and 40 mm launchers in

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/

SECOND AMENDED COMPLAINT
Page 5 of 19

crowd management settings has led to the death of protesters, like in Boston.[3] This fact has led to some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[4]

19. In the past and during the present protests, from May 31, 2020, and onwards, law enforcement has fired these impact munitions indiscriminately into crowds of passively resisting, or other peaceful protesters, both before and after PPB has declared an unlawful assembly/civil disturbance, leaving large welts, bruises, and other similar injuries. Protesters outside in Portland have attested to being fired upon and hit by such munitions by law enforcement standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threated anyone's life or safety.

### III. PPB's Pattern and Practice of Targeting Police Accountability Protesters

20. On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence

---

[3] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at https://www.nytimes.com/2007/02/23/us/23pepper.html
[4] *Id.*

between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

21. Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, a Black Lives Matter leader, less than two weeks prior.

22. Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy

police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### IV. PPB's Pattern and Practice of Illegal Use of Force at Protests

23. PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020, and onwards, PPB regularly used force consistent with this policy and practice against people like Plaintiff, *i.e.*, without individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

24. Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020, that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 2-10, at the scene.

25. Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-10, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

26. In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB

focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

27.     PPB broadly portrays all force as justified and evaluated itself as doing an *excellent* job handling the nightly protest.

28.     PPB has a pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse.

29.     PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals for most of the summer of 2020.

30.     PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

31.     PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

32.     The PPB supervisors assigned to complete AARs had little to no crowd management training.

33.     PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

34.     PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after DOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the DOJ's required standards.

35. PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force. This unconstitutional policy is justified, in part, by a different directive, PPB Directive 635.10.

36. Ultimately, almost one year after the death of George Floyd, Defendant has failed to acknowledge "the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations." Since May 31, 2020, the City has increased its inventory of crowd control weaponry for use against demonstrators.

### V. Court Orders and Contempt

37. As a result of PPB's lawless uses of force against protesters, Federal and State Courts in Oregon have used their remedial powers to restrain PPB's excesses.

38. The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction placing limits on police use of force at protests shortly after filing their case. The Court later found that PPB's conduct on June 30, 2020 violated the Court's order—specifically owing to the use of impact munitions shot at protesters who were not actively aggressive.

39. Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot police with incorrect use of force standards, such as with citations to opinion overruled in *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) and with

incorrect descriptions of protesters walking slowly as "actively aggressive." One training concluded with a slide that caricatured police accountability protesters and advocated for violence against them.



40.     The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

41.     The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116 was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. That Oregon law prevents law enforcement from surveilling people because of their political activities. The State court enjoined PPB from this practice in September 2020.

42.     As partly discussed above, the United States Department of Justice has maintained a quasi-consent decree against the Portland Police Bureau because of its pattern and practice of using excessive force against people with mental illness. *United States v. City of Portland*, Or.

Dist. Case No. 3:12-cv-02265-SI. As part of its obligations under the settlement agreement the City had entered into with the USDOJ, PPB had to maintain records regarding its use of force and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement agreement owing to its actions in 2020 and has sought remedial sanctions against the City of Portland.

43. As described in the preceding paragraphs, numerous courts have found that PPB has violated the law on multiple occasions—acutely so in the summer of 2020, when they injured Plaintiff.

### VI. July 4, 2020

44. On the late-evening of July 4, 2020, Plaintiff was present at a protest in Southwest Portland. Plaintiff had been passively protesting throughout the summer despite having witnessed PPB use mass violence to squelch his speech rights.

45. As with other nights, PPB chased a group of protesters who had come out in support of Black lives out of Downtown. The police chased people, including Plaintiff, several blocks north up SW Fourth Ave. towards Burnside. At one point, the crowd moved east down SW Alder towards the waterfront. The crowd was then pushed northward on SW Second Ave.

46. Plaintiff was complying with police orders to disperse. Mr. Pearce had his back facing the officers and was actively walking away. Then, without warning, the named-MFF officer Defendants shot Mr. Pearce in the back of his calf with an impact munition. Plaintiff estimates that this occurred between the times of 11:45 pm on July 4th and 12:10 am on July 5th. The location was in the vicinity of SW Second Ave., between SW Yamhill St. and SW Harvey Milk Street.

47.     Plaintiff was not facing the officer at the time he was shot, but his friend identified the munition on the floor. It was a 40 mm munition. The shot took him by surprise. The individually-named MFF Defendants—Whitmore, Hemmerlein, Brunelle, and Rains—were all present and firing their 40 mm launchers at the crowd. None of them had probable cause to shoot and injure Plaintiff. They did not attempt to arrest him nor take him into custody. He had not been committing a crime, nor exhibiting signs of being "actively aggressive." He posed no threat to the officer. To the best of his knowledge, no one around him had been actively aggressive, nor had anyone in his group been targeted for arrest following this shot.

48.     By information and belief, the named-MFF officer Defendants shot Plaintiff in retaliation for protesting police that evening. This is evinced by their actions on the evening in question in relation to the speech being made by Plaintiff, by the Bureau's actions and statements throughout the Summer of 2020 and during prior demonstrations, and their training that goads PPB officers into wanting to injure protesters, whom they view in dehumanized caricature.

49.     Forty millimeter launchers are dangerous and potentially deadly weapons. Despite Defendants Whitmore, Hemmerlein, Brunelle, and Rains committing a felony of criminal Assault in the Second Degree (ORS 163.175) in plain view of the other officers on numerous occasions that night, including against Plaintiff, none of the other PPB officers intervened or arrested these 40 mm grenadiers. This is in accordance with the PPB pattern, practice, and/or custom to excuse the constitutional violations and criminal actions of their own, encourage violence amongst their members while at protests, and flagrantly violate constitutional rights while at protests.

50.     Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020, that the decisions to use tear gas, other riot control, and "less lethal" weapons against a crowd of

protesters the evening prior are made by incident commanders at the scene. As such, the decision to use tear gas and "less lethal" weapons against the crowds containing plaintiffs on the majority of dates from May 29, 2020, through to the date Plaintiff was injured was made by incident commanders on scene. As alleged above, the decision to fire on all protesters—including Plaintiff—came from Defendant Craig Dobson, who was the incident commander on the night in question.

51.    The decision by Defendant Dobson was made at a sufficiently senior level, and was later ratified by even more senior officials such as the Operations Chief for PPB, the Police Chief for PPB, and the Mayor of Portland Ted Wheeler, who also serves as the Police Commissioner, to constitute the decision to collectively punish protesters like Plaintiff as official City policy. A reasonable City official would have known that such a policy violated the Constitution.

52.    In shooting Plaintiff, the officer caused him pain and damaged his calf and Achilles tendon. After the shot, Plaintiff's leg swelled and the skin began peeling off. Plaintiff was barely able to walk for the next couple days due to the swelling and bruising on his right calf. He did not attend another protest for around two weeks because of the pain and the trauma from that night. Plaintiff did resume protesting regularly after taking time to heal physically and emotionally. The shot has resulted in continued pain and damages by contributing to scar tissue in the area which has exacerbated his Achilles tendon issues. Plaintiff continues to engage in physical therapy because of this injury from the Defendants.

### Claim 1: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

53.    It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

54.     In taking the actions described above, including but not limited to shooting an unarmed, passively resistant at most person with a 40 mm impact munition, the individually-named MFF officer Defendantsintentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

55.     Defendants Whitmore, Hemmerlein, Brunelle, and Rains violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to Defendants Whitmore, Hemmerlein, Brunelle, and Rains could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendants Whitmore, Hemmerlein, Brunelle, and Rains therefore does not have qualified or statutory immunity from suit or liability.

56.     The actions of Defendants Whitmore, Hemmerlein, Brunelle, and Rains, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendans Whitmore, Hemmerlein, Brunelle, and Rains, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

57.     Defendants Whitmore, Hemmerlein, Brunelle, and Rains each failed to intervene while committing these violations, which is another source of constitutional liability for them. Defendants Whitmore, Hemmerlein, Brunelle, and Rains had an affirmative duty to intervene.

58.     Defendant Dobson participated in Plaintiff's injury by failing to supervise and discipline Defendants Whitmore, Hemmerlein, Brunelle, and Rains, and/or by directing Defendants Whitmore, Hemmerlein, Brunelle, and Rains to fire upon Plaintiff. His direct participation in the injury caused Plaintiff's rights to be injured.

59.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to his Achilles tendon. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 2: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability**
**(42 U.S.C. § 1983)**

60.     As described in Claim 1, Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson violated Plaintiff constitutional right to be free from unlawful seizures.

61.     Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson's conduct is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

62.     Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the force is clearly excessive or when the arrest was without sufficient legal justification. Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

63.     Defendant City of Portland failed to train and discipline its officers, including Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson, to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson engaged in unconstitutional conduct that resulted in harm to Plaintiff.

64.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to his Achilles tendon. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 3: First Amendment — Unlawful Retaliation Against Speech — Individual Liability (42 U.S.C. § 1983)**

65.     As described above, Defendants targeted Plaintiff for injury not because they had probable cause, but because they took offense to Plaintiff's speech activity.

66.     The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

67.     Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson's retaliatory motive was the but-for cause of Plaintiff's injuries. By shooting at and injuring Plaintiff, Defendants chilled Plaintiff's political speech, violating his First Amendment rights.

68.     The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to his Achilles tendon. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 4: First Amendment – Unlawful Pattern and Practice – Municipal Liability (42 U.S.C. § 1983)**

69.     As explained in Claim 3, Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson violated Plaintiff's constitutional speech rights.

70.     Defendants Whitmore, Hemmerlein, Brunelle, Rains, and Dobson's conduct, and the conduct alleged in paragraphs 10-52, is illustrative of a pattern and practice of PPB officers violating the First Amendment rights of individuals at protest demonstrations against police

misconduct. Defendant City of Portland has a custom and practice of using militarized force against left-wing or antifascist protestors. Defendants' past Fourth and First Amendment violations were intended to punish a group of protestors *en masse* for their political speech. Defendant City of Portland does not use such tactics against right-wing protestors or fascist protestors, such as the Proud Boys or Patriot Prayer, despite their disobedience of officers' orders and clear intent to terrorize the community of Portlanders.

71. Defendants' retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to his Achilles tendon. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### Claim 5: Battery
### (State Tort)

77. Pursuant to a statutory tolling law passed by the Oregon legislature during the pandemic, Plaintiff submitted a timely tort claim notice against the City on March 31, 2022.

78. As described above, agents of the Defendant City of Portland did unlawfully intend to come into physical contact with Plaintiff, and did come into contact with Plaintiff. Defendant City's unlawful and intentional contact with Plaintiff was offensive.

79. The battery against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish, and an exacerbated injury to his Achilles tendon. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### REASONABLE ATTORNEY'S FEES AND COSTS

80. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

81. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For economic and non-economic damages in an amount to be determined at trial;

B. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

C. Such other relief as the court deems just and proper.

DATED: July 4, 2022.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Alex Meggitt*
Alex Meggitt, OSB #174131
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*